The next case on the call of the docket is Agenda No. 5, Case No. 131710, Griffith Foods International v. National Union Fire Insurance Company of Pittsburgh. Counsel for the Appellant, are you ready to proceed? Yes. Please proceed, Counsel. Thank you, Mr. Chief Justice, and may it please the Court, Tom Dupree on behalf of the National Union. The question before this Court is whether there is an unwritten permit exception to the pollution exclusion in standard general commercial insurance contracts. We submit the answer is no, based on the plain language of the pollution exclusion, this Court's decision in columns, and considerations of policy and common sense. For more than 20 years, these companies, Griffith Foods and Sterigenics, pumped thousands of tons of toxic gas, ethylene oxide, into a residential community in Willowbrook. They now come to this Court saying that they should not be forced to bear the costs of defending the hundreds of lawsuits brought by those who lived, worked, or went to school in Willowbrook. And that is a point I want to underscore for the Court at the outset, that the victims' recoveries are not at issue today. All the victims, the underlying cases have settled. The victims, all the victims or almost all of the victims, have already been compensated or money for their recovery has been placed in funds for an escrow. May I ask right there, so that I'm clear, what we have in front of us? We have a declaratory judgment action that seeks to recover, and I want to make sure I'm right about this, the defense costs. In other words, am I correct that this complaint, the declaratory judgment complaint, does not seek indemnification pursuant to the insurance policy? Is that correct? That's correct. We're here. It's the duty to defend, which, as Your Honor noted, does implicate defense costs. At an earlier stage in the case. But let me say this, too. It also implicates coverage. In order to determine if there's a duty to defend, the inquiry will be whether or not there was potential for indemnification. So we're kind of in this gray area that I want to make sure we're all speaking the same language. Can I ask you another question, since obviously you're very familiar with all this? Do you know if during the time period when this policy was in effect, 83 and 85, was there any other insurance product that would cover indemnification for pollution? Sure. Pollution insurance. Pollution insurance is something that has come on the market, particularly in recent years. And to Your Honor's question, it does provide coverage for precisely the type of emissions that are at issue here. But, of course, they're not litigating a pollution coverage policy. They're litigating and demanding coverage under a general commercial insurance liability policy. But, to Your Honor's fundamental question, is other insurance available? Yes, absolutely. In fact, that's a big part of our argument as to why commercial general insurance policies shouldn't be expanded to provide coverage when there is a product on the market that is available that covers precisely the type of emissions at issue here. If I could begin with a plain text of the pollution exclusion. The pollution exclusion excludes coverage for claims involving bodily injury that result from the discharge of toxic gases. The pollution exclusion says nothing about permits, about permitted emissions, about compliance with government regulations, about government authorization. Those words simply do not appear in the pollution exclusion. This court has often said, it has repeatedly said, that when it interprets insurance contracts, it gives them the reading that a normal, average, reasonable person would. And I would submit to this court that if we were to grab a hundred normal, average, reasonable people off the street and ask them, do you think that emitting ethylene oxide from your factory smokestacks for decades into a residential community is pollution? I am confident you would get a hundred answers of resoundingly yes. So if this court adheres to the normal way that it has historically construed language in insurance policies, just give it an average, normal reading, this is an easy case. There can be no serious dispute that putting ethylene oxide into a residential community is pollution. So let me break down what you're saying in just a small, bite-sized piece so I can understand it. You're saying that pollution is pollution regardless of whether it's regulated or not. And if the policy excludes pollution, it excludes all pollution. Is that what you're saying? Yes. Thank you. Yes. And Your Honor actually put it very well. In other words, pollution is pollution. And I think just from a plain English perspective or frankly from a common sense perspective, the argument that my friends are making today that, well, if that factory owner that's belching smoke into the community has a permit in hand, well, don't believe your eyes. Don't believe your tearing eyes and flowing nostrils. That's actually not pollution because we have a permit. That can't be right. That has never been the law of Illinois and it is not the law of Illinois. To further buttress our plain language argument, I would also want to direct the Court's attention to a neighboring provision in the policy in the list of exclusions. And this is the alcohol sales policy. It's in subsection H. And what that says is, in fact, there is an exception for sales that are authorized under law. Going to first principles of contract construction, which this Court often does in insurance cases, I think it stands to reason that if the policy contains an express government-authorized exclusion in one provision but not in another, that is a deliberate choice that indicates strongly that there is no unwritten exception to the pollution exclusion. The other point I would like to mention to talk a little bit about the Columns case is this Court in Columns, of course, defined the pollution exclusion or interpreted the pollution exclusion as excluding coverage for what the Court called traditional environmental pollution. And here, too, I don't think there can be much of a serious debate that what happened in Willowbrook is the classic example, the textbook example of traditional environmental pollution. Pumping a carcinogenic toxic gas into a residential neighborhood is clearly traditional environmental pollution. There's not a word in Columns that suggests that having a permit in hand somehow changes the nature of the gas from a pollutant into a non-pollutant. There's nothing that suggests that in Columns. In fact, what Columns was concerned about, one of the concerns that really, I think, drove the decision in Columns was a concern that, well, if we construe the pollution exclusion to encompass things that just ordinary people wouldn't deem pollution, you know, a spilled bottle of Drano or the like, that could give the pollution exclusion too broad a scope. And here, the same concern exists, except it's the mirror image. If this Court were to recognize what my friends demand, a permit exception to the pollution exclusion, that would be the end of the pollution exclusion for all practical purposes. And that is because in 2025 America and in Illinois, pretty much every pollutant or, you know, certainly if we're talking kind of large industrial polluters, do so either with a permit or under the auspices of a space that is heavily regulated at the federal, state, and local levels. In other words, pretty much everyone either has a permit or is operating under some sort of regulatory scheme. You need a permit in order to discharge gases into the air. You need a permit in order to dispose of wastes or sewage into the water. You need a permit to bury materials under the land. And if that permit were essentially your get-out-of-jail-free card, there really would be no purpose left to the pollution exclusion. This was the point the Seventh Circuit made where it said, look, you pretty much have a very heavily federally regulated space here where everyone needs a permit to do everything. And so recognizing this permit exception would basically wipe out the pollution exclusion as we now know it. And it would really have virtually no application anywhere. In fact, you could see situations where even someone who didn't have a permit, you know, kind of, I don't know, a midnight dumper or something like that, could make the argument that, well, actually, this is justified under some regulation. And presumably, at least under my friend's understanding of the pollution exclusion, that would be enough. And that can't be right. The other concerns that were motivating the Columns Court is the court looked at history to say, how did the pollution exclusion come into existence? What was it intended to address? And the court correctly traced the history. Pollution exclusion arose out of the environmental disasters that happened at Love Canal and Times Beach. And the court correctly noted. It said the pollution exclusion exists to protect insurers from having to bear liability for these large-scale industrial disasters, such as the ones that happened at Love Canal and Times Beach. And that was why this court did not want to extend the exclusion to, again, the guy who spills a bottle of drain. That wasn't what the pollution exclusion was to get at. This case, I think, also presents a textbook example of the type of environmental disaster that the pollution exclusion was created to address. To say the least, this is far closer to Love Canal and Times Beach than to the spilled bottle of drain. This is a heartland application for why the pollution exclusion exists. And the court finally also looked to the fact that many lower courts had interpreted the pollution exclusion. This is in Columns. The court looked to how other courts have interpreted the pollution exclusion and noted that, well, there were other courts that had already limited the pollution exclusion to traditional environmental pollution. And here, that consideration cuts strongly in our favor. If this court were to adopt the argument presented by my friends, it would make Illinois the first and the only state in the nation to recognize a permanent exception. No other state recognizes it. This court has historically been a leader in environmental protection and ensuring that polluters bear the cost of the harm that they cause. And I would submit that it would be a sad and ironic ending to the Willowbrook saga if this court were to reach the result that, well, polluters actually do have an exception. They don't have to bear the costs of their own pollution. They're absolved from liability so far as they have a permit. And also, I realize you're saying that the permit doesn't come into play and that it should not be allowed. But do the permits themselves require that basically they don't release a person from liability for any loss due to damage to a person resulting from the operation of the plant, right? That's exactly right, Your Honor. That's exactly right. And I think that really underscores what this court has said, that just because you have a permit doesn't mean you can't still be a polluter. A permit is not a license to pollute. And the language that Your Honor correctly quoted that says you have this permit, but keep in mind this permit doesn't absolve you from liability. In other words, you can be both a permit holder and a polluter. That's the key point of the language Your Honor quoted. The fact that you can be both a permit holder and a polluter is what destroys their argument. Because their argument rests on the notion that if you have a permit, anything you do, no matter how awful, no matter how destructive to the environment or human health, it's not pollution. That's their argument. And what Your Honor just quoted shows exactly why they are wrong. This is a case that came to us by certification of the Seventh Circuit. They framed a question to us for us to answer. They also said if we wanted to reframe it, we could. But assuming that we're going to look first at how they framed the question, they directed us to look at, of course, the Columns case as well as an Erie Insurance Exchange case from our public court, and asked us what relevance, if any, does a permanent regulation authorizing emissions, generally or at a particular level, play in assessing the application of a pollution exclusion within a standard form commercial general liability policy? One, do we need to reframe that question? Two, how should we answer it? Sure. My answers are to point number one, no, and to point number two, none. So the first question about should we reframe the question, no, I don't think there's any need to reframe the question. The Seventh Circuit, as Your Honor correctly noted, did not ask this court to decide whether we have a duty to defend or anything like that. The question that the Seventh Circuit presented to this court is simply what is the relevance, if any, as Your Honor correctly quoted, of a permit or regulation application of the pollution exclusion? I don't think there's any need for this court to reframe that question. The second part of Your Honor's question about what should our answer be, I think the cleanest answer and the correct answer is none. There is no relevance to a permit or a regulation in determining the applicability of the pollution exclusion. And I think, actually, Your Honor's question does tease out, I think, an important point here is that providing that answer to say none is not only legally correct for all the reasons we've been discussing, but it also would be far and away the cleanest possible rule that would guide conduct for insurers, for insured parties in the State of Illinois. In other words, if the court were inclined to accept my friend's argument that, well, we should have a permit exception, that in turn will raise very difficult questions for other judges and, again, for insurers when deciding how to price policies, in terms of insurers when figuring out if they have coverage or not, if the answer was, well, we have to look at the terms of the permit and we have to see if there's a liability shield or exactly what it says, or in the case of a regulation, that would cause insurers, insured parties, judges to have to parse regulations and say, well, what is alleged from the underlying complaint fall within the regulation? In other words, it would open a Pandora's box of complexity if this court were to take even one step down the road of saying, well, a permit or a regulation might have some relevance in some situations. Again, the cleanest answer, the correct answer is none, no relevance. The final point I'd just like to make in the remainder of my opening time are just the underlying policy considerations, which, again, I don't think need to play a leading role because I think we win on plain language and columns, but I will mention them for completeness. I think it probably goes without saying that there would be very obvious significant downsides to announcing that Illinois is open for business for polluters by planting a flag and saying we're going to be the only state to recognize a permit exception. It would basically be telling companies that, look, you come to Illinois and you've got some operation that's making emissions, such as a sterilization facility in the Willowbrook neighborhood, and you can rest assured that without having to buy pollution insurance, you would be covered, in theory, by your general commercial liability policy. Again, my sense, based on this court's prior decisions, is that Illinois typically — Are they asking for payment of the legal fees? I mean, the duty to defend and the duty to cover the liability are two different things. They're asking here that they want their attorney's fees paid. Isn't that what this is all about? Your Honor is right that what we are here today on is this question of the duty to defend. And you're also correct, and Honor is also correct, those are two different inquiries. In other words, the duty to defend inquiry is different than the ultimate indemnification inquiry. But as some of the prior questions teased out, there certainly can be overlap. And in this case, at least, my friends, they are seeking both covering their duty to defend legal costs and indemnification under these policies. But to Your Honor's question, on this case, in this posture, at this time, what is up on appeal is that determination that was rendered in the context of the duty to defend. Thank you. So I see my light is on. Unless there are further questions, I'll reserve the remainder of my time to reply. Thank you, counsel. Good morning. Good morning. Mr. Chief Justice, and may it please the court, my name is Gary Feinerman. I'm counsel for Sterigenics, and I'm here to present argument on behalf of Sterigenics and its fellow policyholder, Griffith. Before starting, I want to take a short detour to address my friend's suggestion that the policyholders are polluters. They are not polluters as a matter of Illinois law as determined by the General Assembly and as determined by the Illinois Environmental Protection Agency. That's a point we made in our briefs. Our amici made that point as well, and I'll return to that shortly. But nor are they polluters in the general sense of the word. The policyholders were engaged in an entirely prosocial enterprise, the sterilization of medical devices. As our amici observed, for half the medical devices in the United States, ETO is what is used to sterilize them. And for some medical devices, it's the only choice. And pertinent here, the policyholders did not just stand up their facility and begin operating. Rather, they cleared their operations with the Illinois Environmental Protection Agency, with the agency. They obtained construction and operating permits that expressly authorize their annual ETO emissions. Before moving on, I wanted to touch upon a couple questions. Have they complied with those permits? And I guess, quite frankly, I wonder, does it even really matter when the question here is whether or not a permit even applies? Yes, they did comply with the permits. There are allegations in the underlying complaint that there was not compliance. But for duty to defend purposes, that doesn't matter. As the National Union acknowledged at page 33 of its opening brief, the underlying complaint alleges injury. It brings tort claims under the common law for both permitted and unpermitted emissions. And under the role print packaging case, for duty to defend purposes, not necessarily for identification purposes, but for duty to defend purposes, if an underlying complaint alleges both permitted and unpermitted emissions, in other words, if it alleges claims that potentially fall within coverage and other claims that don't potentially fall within coverage, the insurer has to defend the entire case. And then kind of sorting things out, what's covered and what's not covered, happens at the end with respect to indemnification. And as my friend acknowledged, indemnification is not at issue in this case, which brings me to the next question. Mr. Fenner, just so I'm very clear, when you say this case, this appeal or this declaratory judgment action, are you at any place asking for indemnification? There are state court proceedings where we're asking for indemnification. In this case, we are not. The original coverage deck actions did ask for indemnification, but those claims were voluntarily dismissed. And Judge Rowland addressed that in the second opinion in the appendix. So for this case, the only thing at issue is the duty to defend. In this case, we will not be going back and seeking indemnification because those claims were voluntarily dismissed. However, you say that there are ñ are you ñ your clients involved in these state claims where there's a request for indemnification under the same policy? There is. Yes, we are. But, again, this case turns only on the duty to defend, which is why, to your question, my friend ñ interconnected, all right? Coverage, indemnification, and duty to defend, right? Right. We're going to be looking at this potential coverage. If we were to say here, and answer the question of the Seventh Circuit, a permit has no relevance, what does that do to your indemnification claims in the state court? If you were to rule in favor of national union on the duty to defend, we'd have a very tough time on the duty to indemnify. That's for sure. But as this court has made clear, the duty to indemnify is different and much narrower than the duty to defend. If the facts alleged in the underlying complaint give rise to the potential for coverage, the potential for coverage, the insurer owes a duty to defend. Not that there is, in fact, coverage. That's indemnification. But the potential for coverage, which kind of brings me to your question, Justice Tice, to my friend, as to whether the question ought to be reformulated, the question certified by the Seventh Circuit. We argued yes, although in the end it doesn't matter. We argued that it should be reframed in two particular respects to make the question directly pertinent to what we have here. As I just mentioned, we're not seeking indemnification. We're just seeking a duty to defend. We're just seeking our defense costs. The certified question covers both, and because the duty to defend is broader, it would be more pertinent to just answer the duty to defend question in this case rather than the duty to indemnify. The second way in which we suggest that the question be reformulated, right now the question is formulated to address both permits and regulations. We're not making an argument based on regulations, generally applicable regulations. It's a point that my friend glossed over time and time again, both in their briefs and up here at the podium. We're not making an argument about regulations. We're making an argument about permits, and that's important. Regulations are generally applicable. When an entity gets a permit and the permit is issued, it's based on an individualized assessment by the expert agency that is charged by Illinois law with implementing the Illinois Environmental Protection Act. The agency goes to the entity, here the policyholders, and says, you, you in particular, can have emissions up to a specific level, and under Illinois law, when an agency does that, it is necessarily saying to the entity, you are not engaged in pollution because under Section 8, Section 9A, under Section 39A and under the definition of air pollution, air pollution are emissions that go above a certain level, and if the expert agency says you can emit up to that level, it may be if you pull 100 people off the street who don't know anything about environmental law, and I have to confess that before taking part in this case, I may have been among those 100. They might say it's pollution, but the body that determines the public policy of Illinois, the General Assembly, said very clearly in Section 8, Section 9A of the Act, sections that I should mention, National Union did not address either in its opening brief or quite surprisingly in its reply brief where we made quite a big deal about those provisions in our opposition brief. So we're not dealing with regulations, we're dealing with permits. Right. Is there any other state that recognizes a permit exception? There's no other state that recognizes a permit exception. There also is no other state that has rejected a permit exception. My friends cite the Hawaii case and the New York case. The Hawaii case has nothing to do with permits. The New York case did reference permits in the context of addressing a question regarding the sudden and accidental provision in the pollution exclusion, and it really doesn't say much of anything. It certainly doesn't address whether permanent emissions are traditional environmental pollution under this court's decision in commons or under the decisions of other state supreme courts that have also adopted in the wake of commons the traditional environmental pollution understanding of pollution exclusions. And just getting back for a brief moment to the distinction between regulations and permits, our appellate court in the Ironshore case, which was the Crestwood case that was the companion to the Scottsdale case in the Seventh Circuit, made that exact point in paragraph 23. The village there argued that its emissions were not traditional environmental pollution because they fell below the levels allowed by regulation. And what the first district said in response is it rejected that argument, and the reason it rejected that argument is that the village, quote, did not have a permit to distribute the water from the contaminated well. So a case that National Union has relied on quite heavily makes the very distinction that we've made in our briefs and that we suggested that the court consider reformulating the question presented to address. I want to step back and take the opportunity to just briefly touch upon the settled insurance law and environmental law principles that govern this dispute, principles that Griffith largely glosses over. I've already talked about how this is a duty to defend case, not a duty to indemnify case, and the applicable standard in a duty to defend case is that in ascertaining the scope of the defense obligation, and particularly of an exclusion, the question is not whether the policyholder's reading is the best interpretation, but whether it's a reasonable interpretation. So an exclusion, like the pollution exclusion, will apply only where its terms are clear, definite, and specific, or where the insurer's reading is the only reasonable reading. And this court in Columns, Columns obviously is the principal precedent that this court will be interpreting in this case. As a court held in Columns, the standard form pollution exclusion is ambiguous and applies only to traditional environmental pollution. And the examples that Columns gave of what is traditional environmental pollution, it's the disasters at Times Beach, the disaster at Love Canal, at Torrey Canyon, situations where, unlike in this case, the entities in question did not have a permit. The government agency did not say you can dump all this toxic sludge into the river or into the canyon. And that's important, not only because the policyholders had a permit here, but it also plays into the principles of environmental law that I touched upon just for a moment a little while ago, and that I'd like to focus on just for a moment here. The Illinois Environmental Protection Act makes clear that permitted emissions, emissions that an agency, that the Illinois Environmental Protection Agency expressly authorized, are not pollution in the first place. And if they're not pollution in the first place, they, of course, can't be traditional environmental pollution. Section 8, which I mentioned a moment ago, says that the purpose of the act is to assure that no air contaminants are discharged into the atmosphere without being given the degree of treatment or control necessary to prevent pollution. And the key term there is prevent pollution. Section 9A likewise says no person shall cause the discharge or emission of any contaminant into the environment so as to cause or tend to cause air pollution. So air pollution is outlawed, and the point is reaffirmed by a provision that National Union cites in its reply brief, but doesn't really pay close enough attention to. The act defines air pollution, and this is Section 3.115A, as the presence in the atmosphere of one or more contaminants in sufficient quantities, in sufficient quantities, as to be injurious to health, human, plant, or animal life, or health. So the term pollution, under Illinois law, as determined by the General Assembly and as implemented by the agency, does not mean that the release or discharge of any emissions into the environment. Rather, it means emissions above a certain level, and that's where a permit fits in. Under Section 39A of the act, it directs the agency to issue permits that allow activities that do not violate the act or its regulations. What does it mean to not violate the act or its regulations? It means that it does not cause pollution, which means in turn, because we know what pollution means, pollution means contaminants in sufficient quantities. It means in turn that the permits do not allow emissions above a certain level. They don't allow pollution. So when the IEPA, when the agency issued its permit, and then subsequent permits to the policyholders, based on an individualized evaluation of their activities and their emissions, it necessarily decided that the emissions did not rise to the level of pollution. It did not rise to the level of pollution. It certainly didn't rise to the level of traditional environmental pollution, and this brings me back to the insurance principles that govern this case as well. Can a policyholder reasonably believe that emissions that the agency, based on an individualized inquiry, has expressly authorized under a permit are not pollution, let alone traditional environmental pollution? The answer to that question is yes, and although the policyholders believe it doesn't have to be the best understanding, it needs to only be reasonable, it is in fact the best view, and I think it's the only view you can construe sections 8, 9A, 39A, and 113.5 of the act, and therefore follows, as the appellate court ruled in Imperial Marble and in Bible of Hork, that the pollution exclusion does not bar coverage for underlying suits, alleging injury, at least in part, from lawful permitted emissions, and my friend characterizes this as asking for a permit exception to the pollution exclusion. It's not an exception to the pollution exclusion. It's not covered by the pollution exclusion in the first place. The pollution exclusion, as the columns hold, applies only to traditional environmental pollution. Permanent emissions are not pollution in the first place, let alone traditional environmental pollution, so we're not talking about an exception here. We're talking about whether permanent emissions fall within the scope of the exclusion as it's understood in columns, and my friend's contrary view that a discharge or release into the environment is enough to trigger the pollution exclusion that's made throughout their briefs, if you're to read Justice Heiple's brief dissent in columns, it's really on all fours with that dissent. That was Justice Heiple's view in columns. You look at the plain language. The plain language says contaminants into the environment. If it's contaminants into the environment, it's pollution, and columns rejected that proposition and says, no, it has to be traditional environmental pollution, and again, if it's not pollution in the first place, which it isn't under sections 8, 9A, and 39 of the Act, it can't be traditional environmental pollution. One other argument that my friend made is that so long as government official issues a permit, the permit holder cannot be held liable for its conduct. That's not our argument. We are not arguing that the permit shielded the policyholders from tort suits. In fact, the permit says that it doesn't shield the policyholders from tort suits, which is why the policyholders were sued in those cases in Cook County, and also we're not seeking indemnification here. Rather, we're seeking only a defense to the underlying tort suits, and that question turns on, as I've mentioned, whether a reasonable policyholder could reasonably believe that the emissions allowed by a permit are not traditional environmental pollution, and it's not at all confusing because we're dealing with two separate legal regimes here. There's a common law tort legal regime where emissions that fall within the scope allowed by a permit can give rise to tort liability, and that's true, and we see that all the time, which is why the policyholders need a defense for those suits. What this case concerns is a different legal regime, the legal regime created by insurance law and environmental law. Insurance law is saying that the pollution exclusion covers only traditional environmental pollution, and environmental law, which makes clear that emissions that fall within the level allowed by a permit are not pollution at all, which necessarily means that they are not traditional environmental pollution. I see that I'm almost out of time. If there are any questions, I'd be happy to address them. Can we answer the question as it was framed by the Seventh Circuit? Are you suggesting that we must reframe it? I wouldn't be presumptuous enough to say that you must do anything, but I think that whether you formally reframe the question or not, I think the prudent thing to do in this case is to limit the answer to what this case actually presents. Duty to defend, not duty to indemnify. Permits, not the much broader and perhaps more difficult question concerning compliance with regulations. I see my time is up. Thank you. Thank you, Mr. Farnley. Mr. Dupree? Thank you. Just a few points in response, Your Honor. My friend began by declaring that they are not polluters under Illinois law, and that's wrong for a few reasons. The first is that the Illinois Environmental Protection Act actually defines pollution simply as emissions that are injurious to human health. That's what Illinois law says. Illinois law does not define pollution, as my friend would have it, as somehow unauthorized toxic emissions. No, it just says emissions that are injurious to human health. My friend bases his argument that they're not polluters on the idea that, well, because supposedly the agency, the Illinois Environmental Protection Agency, is tasked with preventing pollution, that by definition, any time they issue a permit, you're not polluting. That is profoundly wrong. It is profoundly wrong because, as this Court surely knows, what the agency is doing is not giving you a blessing or absolution that anything that comes out of your smokestacks for the next 50 years is not pollution. What they are doing is making a predictive judgment. They are saying, look, based on your representations to us, what we think your facility is going to emit and that sort of thing, the mitigation measures you have in play, that we think they are sufficient to reduce or prevent pollution. It is not giving an absolution that anything that happens henceforward is not pollution. My friend made, I thought, a nice concession, but one that I think is ultimately fatal to his case, where he admitted that he would be one of my 100 people on the street who would agree that under a plain language reading this is clearly pollution. I think the reason that gives away their case is because if there's one thing this Court has been clear about in insurance cases over the years is that if a term is not given an actual definition, you just use a plain language, ordinary meaning definition. That's what gives certainty to parties. That's what gives certainty to insurers. That's what gives certainty to insured people, that in determining your insurance coverage or the scope of your obligation, you don't have to, as my friend would have it, consult environmental law professors to figure out, well, what is the precise definition? No, you bring to bear your ordinary common sense reasoning. That's the rule this Court has applied time and again in insurance cases. So when my friend says, yeah, he admits that the average person on the street would read it this way, that's the end of their case. Other points. He says that, you know, in the view of the State of Illinois, they did not, you know, commit or admit pollution. Well, that is wrong for the reasons we mentioned, but it's also wrong because it conflicts with the judgment of, among others, the Attorney General of Illinois, who sued them for admitting pollution. So in the judgment of the chief law enforcement officer of the State of Illinois, they indeed admitted pollution. It also conflicts with the judgment of the General Assembly, which passed the Matt Tower Act specifically in response to Willowbrook, and when the governor signed it into law, he says we have to stop emissions of pollution like this. So in the view of all the coordinate branches of government, including State environmental enforcement officials, they did pollution. They also said, in response to the earlier questions about whether or not there was other insurance available, pollution insurance, the answer is yes. And I would actually call this Court's attention to page 6 of the amicus brief submitted by Zurich, where he reports that my friend's client, Sterigenics, has actually gone to Zurich, where they have one of these pollution policies, and requested coverage on the basis that, well, what they did was pollution, and therefore it's covered by that policy. So although he is arguing in this court, whoa, we're polluters, they are making the exact opposite argument and demanding coverage under their pollution policy to Zurich. Next, my friend was asked a couple questions about whether they, in fact, violated their permits and whether it matters. The does it matter question is easy. No, it doesn't matter because compliance is irrelevant as a matter of law. But even if it were to matter, the answer is no, they did not comply with the permits. This is, as we've been discussing, is a duty to defend case, and in determining coverage for purposes of the duty to defend obligation, you are guided by the corners, the four corners of the complaint. In this case, this is the master complaint, the one filed in state court on behalf of all the Willowbrook victims. That complaint alleges in great detail that they did not comply with this permit in many ways. They violated the fundamental conditions on which they were issued the permit, that they would conduct ambient air monitoring, that they would present a final report showing that their emissions were safe. They didn't do any of that. They also issued the permit on the condition that they would explore reasonable alternative mitigation measures. They failed to do that, too. The complaint also alleges that they made false representations in obtaining the permit. They told Illinois EPA that they would be emitting at a certain level, and, in fact, they emitted at levels far greater than what they had told the agency. They also told the agency that they would build very tall smokestacks in order to at least try to mitigate the harm to the people who were living below. They didn't do that either. So the complaint alleges in many different ways that they did not comply with the permit. They rampantly violated it from day one. So even if this court were somehow inclined to say, yes, we want to recognize a permit exception, it could not possibly apply to a case in which the operative document that guides this court's duty to defend inquiry alleges rampant, massive, continuous violations of those permit obligations. Next, my friend drew the distinction between permits and regulations, and he claimed that, well, no court has recognized a permit or no court has declined to recognize the permit exception, and that's not right. The decision from the New York Court of Appeals, New York's top court, Technicon, discussed in our briefs, they squarely addressed this question. Granted, there were multiple arguments in the case, so there were, you know, different holdings on different issues, but their fundamental holding on the question of the permit exception is there is no such exception. So the New York Court has decided that. There also are numerous cases that we cite in our briefs, and some of the amici have collected literally dozens of cases on this issue involving permits in this type of case with pollution exclusion. And these courts treat the existence of a permit as evidence that it was pollution because the point is is that you only get a permit if you're going to emit pollutants. If what you are emitting is not a pollutant, you don't need a permit in the first place. So the rule that they are advocating turns the entire case law, the jurisprudence from the other 49 states upside down in saying that, well, a permit actually means it's not pollution when, in fact, all the other states treat the existence of a permit as evidence that it is pollution. The final point I want to make is that he argues that their argument is not based on a regulation, but it's based on the permit and that this court should just kind of put regulations out of its mind. I think that would be a mistake for a few reasons. One is that the question the Seventh Circuit certified was on regulations and included permits and regulations as equal because they are both different forms of government authorization for emissions. So at least in the view of the Seventh Circuit, there was not a meaningful distinction to be drawn. And the distinction that my friend attempted to draw in this case where he says, no, no, we're just making a permit argument, we're not making a regulation argument, I don't think that's exactly right because their whole permit argument is based on what he says are the Illinois environmental regulations that say they aren't doing pollution at all. So even the distinction he's attempting to draw, I think, has absolutely no salience in this case. So for all these reasons, if there are no further questions, we respectfully ask this court to answer the certified question directly and to hold that the existence of a permit or a regulation has no relevance to the application of the pollution exclusion. Thank you. Thank you, Counselor. Case number 131710, Griffith Foods International, Inc., versus the National Union Fire Insurance Company of Pittsburgh is taken under advisement as agenda number five. Mr. Dupree, Mr. Feinerman, we thank you for your arguments.